IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

---

| | |
|---|---|
| TALISKER CORPORATION, a Canadian corporation and TALISKER DEER VALLEY CORPORATION, a Delaware corporation,<br><br>Plaintiffs,<br><br>vs.<br><br>PRIME WEST JORDANELLE, LLC, et al.,<br><br>Defendants. | ORDER and MEMORANDUM DECISION<br><br><br><br>Case No. 2:06-CV-1034 TC |

This case involves a dispute involving United States Trademarks 3,096,055, 3,012,537, 3,200,170 and 3,195,527 (collectively, the "Talisker Trademarks") and United States Trademark 3,314,705 (the "Talisman Trademark"). Plaintiffs Talisker Corporation and Talisker Deer Valley Corporation (collectively, "Talisker") own and use the Talisker Trademarks in connection with real estate marketing, recreational activities, and other purposes in the area around Park City, Utah. Defendants Prime West Jordanelle, LLC and Prime West Jordanelle II, LLC (collectively "Prime West") use the Talisman Trademark in connection with real estate marketing in the same area: Park City, Utah

Talisker alleges that Prime West's use of the Talisman Trademark infringes the Talisker Trademarks. Talisker is a real estate developer. Talisker is developing and marketing three residential communities in the area around Park City. Prime West is also a real estate developer

and is also developing and marketing a residential community named Talisman near Park City. In short, Talisker asserts that potential customers for its real estate developments and others are confused because they associate Prime West's Talisman development with Talisker. Talisker argues that its concern is particularly strong for one of its developments called Tuhaye, which is located close to Prime West's Talisman development. Tuhaye and Talisman are both intended to contain luxury homes and a golf course.

Before the court is Talisker's motion for a preliminary injunction barring Prime West from continuing to use the Talisman Trademark in marketing its development. Because Talisker has requested a disfavored injunction, its motion is treated with heightened scrutiny. Even under this standard, however, Talisker has established the elements of a preliminary injunction. Accordingly, Talisker's motion is GRANTED.

## BACKGROUND

### Talisker's Use of the Talisker Trademarks

Talisker is a real estate development company. In 2000, Talisker started planning a residential and golf course development named Tuhaye. Tuhaye was designed to appeal to upper income buyers and its lots range in price from about $300,000 to $3,000,000. Tuhaye is located on land east of the Jordanelle Reservoir in Wasatch County, Utah. In addition to Tuhaye, Talisker is developing and marketing two other residential communities in the Park City area. Those communities are called Empire Pass and Red Cloud, and Talisker started development on both in 2003. In about 2005, Talisker began to sell lots in Tuhaye. Talisker's offices for managing its developments are located in Park City. Those offices have signs that include the Talisker Trademarks. Park City is in Summit County, Utah, which borders Wasatch County, Utah, and is relatively close to the Tuhaye site.

In addition to the residential developments, Talisker also operates several recreational facilities in the Park City area, many of which include the word Talisker in their names. Purchasing homes in any of Talisker's residential developments entitles buyers to belong to the Talisker Club. Membership in that club gives people access to the various amenities offered at Talisker's facilities. Talisker has invested millions of dollars in its efforts to promote its developments and facilities in Wasatch and Summit Counties.

Starting in 2005, Talisker has marketed all three of its residential communities using the Talisker Trademarks, that is, "based on the brand Talisker." (Testimony of Ed Rehill, Prelim. Inj. Hr'g Tr. 50, Aug. 29, 2008.) All of the Talisker Trademarks include the word Talisker in them. The main difference between them is that some of the marks also include different graphics and other words, such as "Talisker Club" and "Talisker Deer Valley." One of the trademarks is the word Talisker alone. Talisker has submitted evidence confirming its practice of using the Talisker Trademarks to promote its developments and facilities. In terms of printed materials, most of Talisker's advertisements contain the names of the developments along with one or more of the Talisker Trademarks, sometimes near each other. It appears to be the exception, not the rule, when one of Talisker's developments is mentioned in print without some reference to a Talisker Trademark. On the internet, Talisker promotes the Tuhaye, Empire Pass and Red Cloud developments on the same website, www.taliskerclub.com. That website features the Talisker Trademarks more often and more prominently than any of the names of the developments. And in terms of in-person marketing, Talisker's sales force appears to refer to Tuhaye in conversation as "the Talisker Club at Tuhaye" as a Talisker sales representative testified at the August 29, 2008 preliminary injunction hearing. (See also Barber Dep. at 10-12, attached as Ex. B to Talisker's Memo. in Support of Prelim. Inj.)

**Prime West's Use of the Talisman Trademark**

In January 2006, Prime West purchased a property in Summit County on which a residential community had been planned. The property is located south of the Jordanelle Reservoir. At the time Prime West bought the property, the development was named Aspens at Jordanelle. The development was planned to include luxury homes and a golf course. Steve Patterson and Nathan Welch were the principals of Prime West at the time of the purchase.

Prime West decided soon after it purchased the property that it would change the name. To help it decide on a new name, Prime West hired Catapult Strategic Design ("Catapult"), which was based in Arizona. Tim Lewis, a Park City-based consultant who was involved in the general marketing strategy for the development, also took part in the decision-making process. The process began in March 2006, when Catapult suggested about 300 possible names at an initial meeting. A second meeting took place a few weeks after the first meeting, but no final decision was made during either meeting. The Talisker name was not brought up in these two meetings.

Mr. Patterson and Mr. Welch stated that after these meetings, they came to an agreement that they liked the name Talisman. That name had not been on the original list of possible names, but the list did include the names Talisman Canyon and Talisman Ridge. Both Mr. Patterson and Mr. Welch denied that they considered the name Talisker when they expressed their preferences for the name Talisman. The record is clear, however, that around the time of the meetings both of them were aware of Talisker's existence and that both knew about Talisker by no later than early April 2006. Specifically, in late March 2006, Mr. Patterson received an email from Leeroy Farrell, who was associated with Talisker. Mr. Farrell's signature block in that email contained the name Talisker. (See Patterson Aff. at ¶ 21.) Mr. Welch also got an

email from Mr. Farrell in early April 2006.  (See Email with Bates number PWJ 687, submitted at Prelim. Inj. Hr'g.)  In the body of that email, which included the Talisker name and trademark in the address and signature areas, Mr. Farrell discussed the Tuhaye development and also referred to Talisker.  (See id.)

In May 2006 another meeting occurred in which the Talisman name was discussed again. That meeting was attended by Mr. Patterson, Mr. Welch, Mr. Lewis, Beth Moon and others. Ms. Moon was a consultant hired by Mr. Lewis in May 2006, to assist him with his marketing of Prime West's development.  According to Ms. Moon, she knew that Talisker was developing Tuhaye, and the plan for Tuhaye was similar to Prime West's planned development.  Ms. Moon "thought that the similarity between the two names [Talisman and Talisker] would be confusing to potential customers and others in the community." (Moon Decl. ¶ 5.)  As a result, Ms. Moon raised a concern about the name Talisman during the meeting.  Mr. Lewis described what Ms. Moon said as follows: "she said something about, in talking around town about Talisman, that it was causing confusion between Talisker and Talisman." (Lewis Dep. at 51, attached as Ex. C to Memo. in Support of Prelim. Inj.)  According to Mr. Lewis, Mr. Patterson dismissed Ms. Moon's concern, indicated that Talisman was going to be the name and said that the topic was closed for any future discussion.  (See id.)

Either before or after the May meeting, Mr. Lewis also had a telephone discussion with Mr. Patterson about possible confusion between the names Talisman and Talisker.  During that conversation, Mr. Lewis told Mr. Patterson that he felt that Tuhaye was an inferior development to Talisman and that "I felt like I didn't want the confusion to take our status to a lower level." (Id. at 54.)  Mr. Lewis indicated that Mr. Patterson did not share Mr. Lewis' concern about confusion during that call.

Prime West is unsure of the exact date that a final decision was made to use the name Talisman, but estimates that the decision was made by late April 2006.  The record indicates that the name was decided upon before any development or marketing had occurred on the planned development.  Once the final decision was made, Prime West hired an attorney to assist them with registering Talisman as a federal trademark.  The application for the name was filed in June 2006.  In the fall of 2006, the Talisman name was first released to the public in connection with Prime West's residential and golf community.

### Confusion between the Talisker Trademarks and the Talisman Trademark

Talisker points to various instances in which there was actual confusion between the Talisker Trademarks and the Talisman Trademark.  Mr. Lewis testified in his deposition that some of his sales forces' acquaintances were confused about the names and "that the confusion lies in the fact that when our people would start talking about Talisman, whoever they were talking to had some confusion as to Talisker, Talisman, which one is it.  They weren't really sure who they were talking about."  (Lewis Dep. at 62.)  Kristen Barber, a real estate agent who sells homes for Tuhaye, explained that potential customers of Tuhaye and others have confused Talisman and Talisker.  (See Barber Dep. at 11-29.)  Mr. Farrell, a Talisker representative, indicated that he was introduced at a meeting by a Wasatch County planner as being affiliated with Talisman.  (See Farrell Decl. at ¶ 3.)

### The Present Action

On December 13, 2006, Talisker brought the present action against Prime West.  Talisker asserts various infringement-related claims under 15 U.S.C.A. § 1051 *et seq.*, the Lanham Act, as well as claims for unfair competition and deceptive practices under Utah state law.  Talisker requested both monetary and injunctive relief in its complaint.

Talisker filed this motion for a preliminary injunction on July 18, 2008. According to Talisker, it brought its motion for an injunction when it learned of two lawsuits: one brought by one Prime West entity against another Prime West entity, and one brought against Prime West by a buyer in the Talisman development. Talisker views these suits as indicative of financial troubles for Prime West. Talisker bases its motion on the asserted likelihood of success of its trademark infringement claim.

## ANALYSIS

To obtain a preliminary injunction, Talisker must establish that: (1) it will suffer irreparable injury unless the injunction issues; (2) the threatened injury to it outweighs whatever damage the proposed injunction may cause Prime West; (3) its proposed injunction would not be adverse to the public interest if issued; and (4) it has a substantial likelihood of success on the merits of its claims. See Schrier v. University of Colo., 427 F.3d 1253, 1258 (10th Cir. 2005). "As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." Id. (citation and internal quotation marks omitted). Mandatory or status quo-altering injunctions are specifically disfavored and they "'must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course.'" Id. at 1259 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975 (10th Cir. 2004) (en banc)).

Talisker has moved for an injunction that changes the status quo, that is, one which alters "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Schrier, 427 F.3d at 1260 (citations and internal quotation marks omitted). Here, before Talisker brought this action, Prime West had begun marketing real estate under the Talisman Trademark.

Moreover, the proposed injunction is mandatory in nature, since there is real possibility that the court would have to supervise Prime West's' compliance with an order to change all of its marketing materials. See id. at 1260 (injunctions which affirmatively require a party to act in a certain way and may require court supervision are mandatory).

Given that Talisker's injunction is disfavored, it must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on [the Tenth Circuit's] modified likelihood-of-success-on-the-merits standard." O Centro, 389 F.3d at 976.

**I.       Likelihood of Success on the Merits**

Talisker is substantially likely to succeed on the merits of its trademark infringement claim against Prime West. To prove its claim of trademark infringement, Talisker must show that Prime West's use of the Talisman Trademark is "likely to cause confusion in the marketplace concerning the source of the different products." Sally Beauty Co., Inc. v. Beautyco, Inc., 304 F.3d 964, 972 (10th Cir. 2002) (citing 15 U.S.C. § 1114(1)(a)). The Tenth Circuit recognizes three types of confusion: direct confusion, indirect confusion, and initial interest confusion. See Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1238 (10th Cir. 2006). Direct confusion occurs when "a defendant's use of the trademark is likely to cause consumers to believe . . . that the plaintiff is the source of the defendant's products or services." Id. Indirect confusion is present when "the defendant's use of the trademark is likely to cause consumer to believe . . . that the defendant is the source of the plaintiff's products or services." Id. Meanwhile, initial interest confusion happens "when a consumer seeks a particular trademark holder's product and instead is lured to the product of a competitor by the competitor's use of the same or a similar mark." Id. at 1238-39.

The Tenth Circuit uses a six factor test to determine the likelihood of confusion:

(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.

Id. at 1239-40 (citing Sally Beauty, 304 F.3d at 972).

### A.     Talisker's Use of the Talisker Trademarks as House Marks

Initially, there is no dispute that Talisker uses the Talisker Trademarks as house marks. A house mark is used to identify a company or the general product line, while the product mark refers to a particular product. See McCarthy on Trademarks and Unfair Competition § 7:5 (4th ed). "Familiar examples are SONY WALKMAN audio equipment, . . . FORD MUSTANG auto and VASELINE INTENSIVE CARE hand lotion." Id. Here, the names Tuhaye, Empire Pass, and Red Cloud are product marks to the Talisker house marks.

Prime West argues that Talisker's use of the Talisker Trademarks as house marks lessens or eliminates any confusion with the Talisman Trademark. Prime West reasons that the Talisman Trademark identifies a single development in Wasatch County, while the Talisman Trademarks are used promote various developments and facilities in Summit and Wasatch Counties, which Prime West sees as dispelling confusion. The proper comparison in assessing possible confusion, Prime West concludes, is between the names Talisman and Tuhaye, which are both communities, rather than between Talisman and Talisker.

The court disagrees with Prime West. First, Talisker uses the Talisker Trademarks in close conjunction with its marketing efforts for Tuhaye. Even if Prime West were correct that the only marks for the developments should be compared here, then, the court would have to consider the similarities between "Talisker Club at Tuhaye" and "Talisman." The more fundamental problem with Prime West's position, however, is that the Talisker Trademarks and

9

the Talisman Trademark are both being used to promote luxury communities and amenities in the same geographical area. Consequently, the court will consider the potential for confusion between the Talisker Trademarks and the Talisman Trademark, keeping in mind the particular ways the parties use them and how the relevant market experiences them. See e.g., Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 556 (10th Cir. 1998) ("The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks.")

### B.      Initial Interest Confusion

The type of confusion Talisker claims here is initial interest confusion. A plaintiff alleging such confusion can be damaged in three ways:

> (1) the original diversion of the prospective customer's interest to a source that he or she erroneously believes is authorized; (2) the potential consequent effect of that diversion on the customer's ultimate decision whether to purchase caused by an erroneous impression that two sources of a product may be associated; and (3) the initial credibility that the would-be buyer may accord to the infringer's products - customer consideration that otherwise may be unwarranted and that may be built on the strength of the protected mark, reputation and goodwill.

Australian Gold, 436 F.3d at 1239.

Here, Talisker has shown that Prime West is going through legal troubles, and that if consumers confuse Talisman with Talisker, Talisker could suffer as a result. That is, if a potential home purchaser hears that the Talisman developers are being sued and/or suing each other, and the same buyer is confused about the competing trademarks, that buyer may decide to avoid having anything to do with Talisker as a result. The same negative impact on Talisker would loom for any other potential problem that the Talisman development might face in the future. In this type of scenario, the potential buyer's initial interest would be called to Talisman,

and what the buyer learned could negatively affect the buyer's decision to buy a Talisker home in any of Talisker's developments.

It is likewise possible that a potential buyer might look into Talisman because he or she had heard good things about Talisker and decide to purchase a Talisman home. In that case, Talisker would argue that its reputation and goodwill was used by Talisman in getting that buyer's initial interest.

Based on the fact that Talisman is a real estate development in Wasatch County, and that Talisker uses the Talisker Trademarks in connection with marketing similar real estate developments in Wasatch and Summit Counties, the court agrees that initial interest confusion is possible in this case.

With these initial issues resolved, the court will move on to assess the likelihood of confusion between the Talisker Trademarks and the Talisman Trademark.

### C.       Likelihood of Confusion Factors

#### 1.        Degree of Similarity Between the Marks

"[S]imilarity of marks is tested on three levels: sight, sound and meaning." Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 925 (10th Cir. 1986). These factors must be considered together, as observed by consumers in the marketplace. A court must not compare the marks side- by-side. "[S]imilarities are weighed more heavily than differences, particularly when competing marks are used in virtually identical products packaged in a similar manner." Sally Beauty, 304 F.3d at 972 (citation omitted).

In this case, it is clear to the court that the visual trappings around the words Talisman and Talisker differ in the competing trademarks. For example, while all the Talisker Trademarks contain the word Talisker, some iterations also contain leaves and skiers, some include the words

Deer Valley and Club, and so on.  Meanwhile, the Talisman Trademark seems most often to appear as the word Talisman accompanied by a bear.  The font in which the words are used in the competing trademarks also does not appear to be identical, though the fonts are not vastly different.  On the other hand, the appearance of the words Talisman and Talisker are quite similar: both begin with the letters T-A-L-I-S.  And these words always appear in each mark.  In the end, the question of how the trademarks look on paper favors neither party.

The sound of the trademarks is strikingly similar.  Talisker and Talisman are both two-syllable words that share the sound "talis" as their fist syllable.  Moreover, it seems that most speakers would place the emphasis on the first syllable when pronouncing either word ("TALIS-man" or "TALIS-ker").  Talisker established that it uses sales events other face-to-face encounters with potential customers and others to market the Talisker developments and facilities.  Accordingly, speaking the word Talisker to consumers is one of Talisker's common marketing practices, and the court sees a real possibility for confusion between the words Talisker and Talisman when sales people speak to potential buyers, and potential buyers speak to each other.  See e.g., Heartsprings, Inc. v. Heartspring, Inc., 143 F.3d 550, 556 (10th Cir. 1998) ("The marketing practices of the parties are particularly relevant in a trademark infringement case because these practices directly impact the way in which consumers experience the parties' respective marks.")  Accordingly, this part of the analysis heavily favors Talisker.

Finally, the court is unaware of any meaning of the word Talisker.  And while a talisman is a good luck charm, there is no evidence that anyone would give that word such a meaning when it is used as the name of a real estate development.  In other words, Talisman has no established  meaning in the context in which Prime West is using it.  As both words are fanciful as used, the meaning issue is neutral.

In sum, the similarity prong favors Talisker.  This conclusion is particularly true because both the Talisker Trademarks and Talisman Trademark are used to market upper end real estate developments in the Park City area.

### 2. Prime West's Intent in Adopting the Talisman Name

Prime West argues that it decided on the name Talisman early in the marketing process because of the name's various qualities and without knowing about the existence of the Talisker Trademarks.  Though its principals were informed at some point that there might be confusion between Talisman and Talisker, Prime West argues, they did not believe that confusion between the two was likely.  Prime West concludes that it did not intend to derive benefit from the Talisker Trademarks by adopting the Talisman Trademark.

Prime West's arguments are unconvincing.  The court will take at face value Prime West's principals' assertions that they were personally convinced that Talisman and Talisker could not be possibly be confused.  Even if this is so, before Prime West used the Talisman Trademark in its marketing efforts, Ms. Moon, one of its own local marketing consultants suggested that, based on "talking around town about Talisman, that it was causing confusion between Talisker and Talisman." (Lewis Dep. at 51.)  Mr. Lewis also expressed concern to Mr. Patterson that possible confusion between Talisker and Talisman might hurt Prime West.  Prime West kept the Talisman name nonetheless, and the record shows that neither Mr. Patterson or Mr. Welch expressed any concern about the possible confusion to their marketing consultants.

That Prime West kept the Talisman name in the face of Ms. Moon's and Mr. Lewis' warnings is revealing.  Prime West's principals appear quite knowledgeable about real estate. And based on the emails from Mr. Farrell, it is clear that both Mr. Patterson and Mr. Welch were aware that Talisker existed and that Mr. Welch knew that Talisker was developing a residential

community. At a minimum, it seems that Prime West must have believed that Talisker did not have a bad reputation, because no reasonable developer would want its project accidentally associated with a bad competitor. But it seems more likely that Prime West believed that Talisker had a good reputation and- at the least- did not mind the potential that Talisman would be mistakenly associated with Talisker.

In sum, the record clearly supports the inference that, despite their protestations otherwise, Prime West intended to benefit from the Talisker Trademarks. See, e.g., Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 389 (2nd Cir. 2005) ("Bad faith may be inferred from the junior user's actual or constructive knowledge of the senior user's mark."). The intent prong therefore favors Talisker.

### 3. Evidence of Actual Confusion

"Actual confusion in the marketplace is often considered the best evidence of likelihood of confusion." Universal Money Centers, Inc. v. American Tel. & Tel. Co., 22 F.3d 1527, 1534 (10th Cir. 1994). Here, Talisker has pointed to several anecdotal instances of actual confusion of Talisker and Talisman by people in the Wasatch and Summit County areas. Those confused include acquaintances of people selling Talisman homes, potential Talisker clients, a Wasatch County planner and others. The court sees these examples as convincing evidence of actual confusion, and gives them weight despite the fact that they would be considered hearsay under the Federal Rules of Evidence. See Heideman v. South Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings.") See also Houdini Inc. v. Goody Baskets LLC, 166 Fed. Appx. 946, 947 (9th Cir. 2006) (holding in trademark case that "the district court did not abuse its discretion in considering hearsay and biased evidence of actual confusion because the rules of evidence do not

14

strictly apply to preliminary injunction proceedings"). Given the actual confusion involved here, this prong weighs heavily in Talisker's favor.

### 4.  Similarity of Products and Manner of Marketing

Talisman is a real estate development, and Talisker is a real estate developer. But there is strong evidence that Talisker regularly associates its marks with each of its developments and facilities, including the Tuhaye project. Moreover, there is no reason to believe that Prime West's marketing efforts for Talisman would be radically different than those used by Talisker for its developments. This factor accordingly weighs in Talisker's favor.

### 5.  The Degree of Care Likely to be Exercised by Purchasers

If this case involved anything other than initial interest confusion, this prong could have been a problem to Talisker's case. The court highly doubts that someone buying a luxury home would do so before finding out the actual identity of the developer. And it would not take much asking to figure out that Talisman was not being developed and marketed by Talisker. But when the type of confusion being considered by the court is initial interest, this factor is little or no weight in the court's analysis. See Vail Assocs., Inc. v. Vend-Tel-Co., Ltd., 516 F.3d 853, 872 (10th Cir. 2008) (noting that if party had proven initial interest confusion, fact that consumers exercised high degree of care would be less important). Accordingly, this factor is neutral here.

### 6.  The Strength or Weakness of the Marks

The record shows that the Talisker Trademarks are quite strong. There are, of course, the millions of dollars in advertisements including the Talisker Trademarks. But more indicative of the marks' strength to the court is the fact that as soon as Ms. Moon was hired by Mr. Lewis to help market the Prime West development with the name Talisman, she saw a possibility for confusion with Talisker. Ms. Moon has years of experience in the local real estate market. This

15

fact, along with Talisker's undisputed extensive presence in Wasatch and Summit Counties, convinces the court that Talisker is a well established and well known name, at least in the relevant geographical area. Meanwhile, the strength or weakness of the Talisman Trademark is unclear to the court. Consequently, this factor goes to Talisker.

Based on the above analysis, it the court believes that Talisker has a strong and substantial likelihood of success of winning its infringement case against Prime West.[1] The court addresses the remaining injunction factors below.

## II.   Other Preliminary Injunction Factors

### A.   Irreparable Harm

Prime West contends that Talisker's waiting for two years after filing its complaint to file for a preliminary injunction undercuts Talisker's current claim of irreparable harm. But the court agrees with Talisker, who argues that new possible harm has become imminent because of the recent actions filed against Prime West and the signal of possible financial troubles these suits send the public. At the hearing on this matter, Prime West also acknowledged a recent steep downturn in the housing market, which intensifies potential problems for any real estate developer.

Prime West further maintains that Talisker is not entitled to a presumption of irreparable harm based on a likelihood of success on the merits, citing eBay, Inc. v. MercExchange LLC, 547 U.S. 338 (2006). While this may be true, Talisker has shown irreparable harm here in the form of potential loss of reputation and goodwill by being confused with the Talisman

---

[1] Prime West points out that its successful registration of the Talisman Trademark makes the mark presumptively valid. Talisker, however, has rebutted that presumption. See Educational Dev. Corp. v. Economy Co., 562 F.2d 26, 28 (10th Cir. 1977) (presumption of validity from trademark registration may be rebutted).

development.  See GTE Corp. v. Williams, 731 F.2d 676, 679 (10th Cir.1984 ) (noting that damage to reputation can support a claim of irreparable harm).  The court does not mean to imply, of course, that Prime West is has a bad reputation, and Talisker did not present any evidence supporting such a conclusion.  But lawsuits, no matter what their underlying facts or merits, can undeniably "spook" potential buyers, and Prime West does not deny that it is being sued.

### B.     Balance of Injuries to the Parties

The next prong requires the court to weigh the balance of the injury that the granting or denial of an injunction will cause to the parties.  Talisker has the potential injury of losing interested customers to Prime West and faces a loss of good will and reputation by being associated with a competitor.  Meanwhile, Prime West would have to go back to square one on its marketing campaign and recall all materials using the Talisman Trademark, undoing a large investment and incurring a new one.  Prime West will certainly have to spend money, perhaps a great deal of money, if this injunction issues.

While the court is not unsympathetic to difficulties Prime West will face in complying with an injunction, it must be noted that Prime West was well aware of possibility for confusion before it used the Talisman Trademark in public.  And as explained by the Tenth Circuit, "when the case for infringement is clear, a defendant cannot avoid a preliminary injunction by claiming harm to a business built upon that infringement." General Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1229 (10th Cir. 2007).  So too here.

### C.     Public Interest

An injunction will eliminate any confusion between the Talisman development and Talisker's developments and facilities.  Consumers will accordingly be better informed about

who is developing and marketing which communities in the Park City area.  Such an injunction will also enforce the Talisker Trademarks.

### **ORDER**

For the foregoing reasons, Talisker's motion for a preliminary injunction is GRANTED. The court therefore ORDERS that the following injunction shall be effective immediately upon the posting of a bond by Talisker Corporation and Talisker Deer Valley Corporation:

Prime West Jordanelle, LLC, Prime West Jordanelle II, LLC and their officers, agents and employees are ENJOINED from using the Talisman Trademark in connection with the advertising, marketing or sale of real estate in Wasatch County or Summit County, Utah.

The parties are further ORDERED to submit simultaneous briefs on September 26, 2008 regarding the amount of the bond that Talisker Corporation and Talisker Deer Valley Corporation must post.  Talisker Corporation and Talisker Deer Valley will be allowed to post the bond upon the order of the court determining the appropriate amount.

DATED this 12 day of September, 2008.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief District Judge